Chief Justice Robertson
delivered the Opinion of the Court.
The decree which this writ of error seeks to reverse, was rendered in favor of the children of William Dulany, deceased, against the personal representatives of Daniel Maupin, deceased, their testamentary guardian, *590 appointed by their father’s will, published and admitted to record early in 1815, and containing the following among other provisions not material to the questions litigated in this suit:—
“ I do allow all my property—land and negroes ex- “ cepted—to be sold, and the money arising therefrom “ to pay all my just debts and funeral expenses, and “ the balance, if any, to go to the education and support “ of my four infant children—my farm on which I now “ live, together with my mill place, I allow to be rented “ out to the best advantage, and any monies arising “ from the same to be equally divided among my chil- “ dren. I allow all my slaves to be hired out in Madi- “ son, and their hire, and any surplus money from sales “ and hire, after schooling and clothing the children, is “ to be put to interest until the youngest child becomes “ of age, when there is to be an equal division of land, “ slaves, and any money that may remain.” ****** “ I also request that this my last will and testament be “ faithfully executed — and, also, that Capt. Daniel Mau- “ pin, of Madison county, is hereby appointed by me as “ guardian for my four children: viz. James, Betsy, “ Jane and William Dulaney. The said Maupin is to “ receive and receipt for any money that the executors “ may have in their hands, and to show to the Court “ that he has applied it well.”
Maupin accepted the trust delegated by the will, and seems to have executed it, in all respects faithfully, until his death, which, as we infer, occurred since 1833, when the youngest of the four children of the testator had attained twenty one years of age, and all of whom he supported in his own family, and educated, until they either married or became twenty one years old.
In 1816, at different times, he received from the executors, in trust for his wards, the aggregate sum of two hundred and forty seven dollars seventy eight cents; and in 1817, at different times, the aggregate sum of one hundred and ninety two dollars seventy two cents — making, altogether, the sum of four hundred and forty dollars fifty cents. In addition to which he may be presumed to have received, for rents, an aver *591 age sum of something like seventy five dollars, annually, during his life, and, during a portion of the same time, about thirty five dollars, annually, for negro hire.
A testator, who died leaving four children, all infants, directed a sale of his personal estate, for the payment of debts &c., the balance, if any, to go to the education and support of his children; his lands to be rented out—the rents to be equally divided among his children; his slaves to be hired out—the hire and any surplus money from sales, after schooling and clothing the children, to be put out at interest till the youngest came of age, and then an equal division among them, of the land, slaves and money left: held, that these expressions in the will should not be taken according to the strict letter, and as constituting separate bequests for different objects; but that the whole should be considered together, liberally and consistently, and construed as devoting the surplus of the personalty, the rents and negro hire to the support and education of the children (the whole being scarcely sufficient for that object;) the residue of the funds, if any, and the interest made on it, to be divided, at the majority of the youngest child. In that way, the guardian had a right to apply the rents of the farm &c., as well as the other moneys, and is entitled to a credit for them so applied.
After his death, this suit in chancery was instituted by William G. Dulany, and his sister Jane and her husband David Thomas, and the administrator and infant child of the other sister, Betsy, (who had died,) praying for an account—the fourth ward, James Dulany, having settled his own account and died.
The Circuit Court having decreed, severally, to William G. Dulany, five hundred and twenty nine dollars nineteen cents; to Thomas and wife, five hundred and seventy four dollars forty eight cents; and to the infant complainant, six hundred and fifteen dollars fifty cents—Maupin’s representatives now complain of that decree ; and we think justly, for the following general reasons:
First. Although the amount allowed to Maupin for his general services, and for boarding and educating Betsy, Jane, and William G. Dulany—estimated by rules and presumptions far from liberal, and, in some respects, unreasonable—exceeded the whole amount of money ever received by him, from the executors, for their benefit; and the aggregate amount, also, of negro hire, computed rigidly, and, in some respects, erroneously, against him— that excess, amounting to about two hundred and thirty dollars, was not allowed to his representatives, because, in the opinion of the Circuit Judge, he had no right to appropriate, to the maintenance and education of his wards, any portion of the rents of the land, or of the interest thereon.
In that view of the case, we cannot concur. The provisions quoted from the will are certainly, in some *592 degree, awkwardly and unskilfully written; they dedicate, (1.) the surplus, if any, of the proceeds of sales of the personal estate to the education and support of the testator’s four children, all infants; and (2.) the proceeds of hire of the slaves to the education and clothing of the children; and the rents of lands are bequeathed to the children, to be equally divided among them, when the youngest shall attain twenty one years of age; at which time, also, there was, by the direction of the will, to be an equal division of land, slaves, and “any money that [should] remain.” Thus, according to the literal import of each distinct sentence of the will, taken separately, the rents constituted a capital fund for distribution among the children, when the youngest of them should become twenty one years old; any surplus of the personal estate, if, after paying debts, there should be any such surplus, was a fund for their education and support; and the hire of slaves was a fund for their education and clothing. Such a literal and exclusive interpretation of each of those provisions, separately, is unreasonable and incongruous. Moreover, though, in one of them, the proceeds of sales, after paying debts, were dedicated to education and support, yet, in another, the letter of the will appropriated the avails of both the hire and sales to education and clothing.
But to ascertain the true objects of the testator, all those provisions for his children should be considered together, and construed liberally and consistently. And, thus considered and interpreted, they authorize the deduction that the testator intended that any little surplus of his chattels which might remain after the payment of his debts, and also the profits which might accrue from his land and slaves, which would, as he knew, be inconsiderable, should constitute an aggregate fund for the education and maintenance of his four infant children, to whom he devised his land and two only slaves, a woman and a boy; and whatever of the intermediate profits which should remain after educating and supporting them, to be equally divided when the youngest should attain majority. There was no *593 motive for excepting the rents of land, that would not equally apply to the hire of slaves ; and it is evident, not only that the testator intended that his children should be educated and maintained by the profits of the estate devised to them, but that he did not know how much, or whether any, of the proceeds of the sale of his chattels, would be left, after paying his debts; and, therefore, he declared that, if any money arising from his estate should, at the appointed time of division, remain, after paying for education and support, it should be equally divided among his children. Moreover, had there been, as the testator seemed to apprehend, no surplus of his personal estate, after the payment of his debts, the aggregate of both hire and rents would have been, obviously, but a scanty provision for the maintenance of his children. And though there happened to be four hundred and forty dollars fifty cents of the proceeds of the personalty, after the payment of debts, even that fund, united with that arising, from hire of slaves, was inadequate to the purpose of proper education and maintenance.
A court of eq. will sanction such uses of a ward’s funds, by his guardian, as it would have directed, if a previous application had been made. And, though the will may direct the rents to be lent out till the youngest child comes of age, & then divided among the children, the court will direct that they shall be applied to their support and education, in the mean time, if they are required for that purpose.
It seems to us, therefore, that, according to a proper construction of the will, Maupin had a right to apply rents, as well as hire and as money received from the executors, to the purpose of properly fulfilling the trust imposed on him by the testator.
Besides, as he was not a statutory guardian, but a mere trustee appointed by the father, equity should now sanction such appropriations by him, as it would have authorized him to make had a special application to a court of equity, for that purpose, been necessary, and been therefore made by him. And we have no doubt that, even if the will should be construed as not giving express power to him to apply the profits of the land to the education and support of the infant devisees, a court of equity would not have hesitated to direct such an application of those profits, as the general purpose of the testator, as to the maintenance of his children, rendered proper, and their interests required.
Guardians appointed by the county courts are required to settle their accounts annually—adding, each year, the interest on the funds in their hands, to the principal. But the act does not apply to testamentary guardians , as they are not within the jurisdiction of the county courts: they are accountable in courts of equity, as other trustees are; and, in like manner, liable for what interest they make upon the funds entrust ed to them, or which they may be presumed to have made by faithful and prudent management.
Rests should be regulated by the circumstances of each particular case. In this—where the testamentary guardian cannot be presumed to have made compound interest, but did probably collect interest occasionally, a rest at the end of each three years, to add the interest then in his hands, to the principal, is deemed proper.
Secondly. It was unreasonable, and therefore inequitable, to charge Maupin with compound annual interest on the rents of the land: first—because the only reason for ever making such a charge against a delinquent statutory guardian—that is, because the statute requires an annual settlement with the proper County Court, by all such guardians, and directs that the balance in their hands of principal and interest, upon each settlement, shall constitute a principal fund—does not apply to a testamentary guardian, who is not required to make any such settlements; over whom the County Courts have no jurisdiction, and who, like other trustees, are subject to the control of a court of equity, according to the general principles of equity, regulating trusts; and, secondly— because, as a trustee, Maupin was not, upon general principles of equity, chargeable with more interest than he actually received, or, as a faithful and prudent fiduciary, he ought, and therefore should be, presumed to have received. And it could not be presumed that he made annual compound interest on the rents, or on any other funds in his hands. But, doubtless, he occasionally made some interest, and loaned it or used it; and, therefore, he ought to be charged with some interest upon interest; and about three years would, we suppose, be reasonable rests, whenever the annual interest was not absorbed by annual disbursements; that is, any interest, for any three years, that might remain after deducting the disbursements for the same three years, should, at the end of that period, be added to the principal fund.
Rests should be regulated by the circumstances peculiar to each case. And three years would, we think, be a reasonable period for making intermediate interest principal, in this case; because, although the relief system prevailed during a portion of the time for which the account is to be taken, yet the will made it the duty of Maupin to make all moneys in his hands productive, by loans, and we presume that, according to an average estimate, he might, and therefore should, have loaned accruing interest at the end of every three years.
The guardian should be allowed for clothing for the wards (there being no suggestion that they were not clothed,) though there is no regular account of it. And for their board also, when it appears that they were kept at school, tho’ they were old enough to earn, their board.
A testamentary guardian was not only, as such, a trustee in eq. but was the grand father of the wards, and had made no charges against them, for his personal services: nothing should be allowed in a decree against his ex'or, on that score. His actual expenses, & compensation for the board and clothing only, should be allowed.
A testator having requested that the guardian appointed by the will should settle with the county court, his settlements there made, are prima facie evidence in a suit in chancery.
Thirdly. Scarcely any allowance seems to have been made for clothing, because, as we presume, there was no regular charge therefor. This was, we think, unreasonable; for there is no suggestion that the children were not well clad. And there was error, also, in with holding any allowance for board for some years, when—though the children were old enough to render useful service, equivalent, perhaps, to the value of their board—it is almost certain that they were, for a great portion, of the time, at school.
And it was hard, also, to charge for-hire of the negro woman, for some years, when she was in such a condition that the children, who were then, keeping house, kept her alternately among themselves, as a distributive burthen, rather than benefit.
But we are of the opinion, also, that—being both. trustee and grand-father of his testamentary wards, and not having made any stipulation, or even charge, for mere personal service and care—the Circuit Court erred, to the prejudice of the defendants in error, also, in allowing to Maupin compensation for such service and care. His actual disbursements, so far as proved, or as should be presumed, should alone be reimbursed.
But this curtailment, which may appear, and possibly may be, somewhat harsh, fortifies the claim to a full, reimbursement of his actual expenses, and a reasonable compensation for board and clothes, to be ascertained, by the ordinary standard, combined with the fact, that the persons whom he kept in his family, and fed and clad, were confided to his protection, chiefly, if not solely, because they were his fatherless and motherless grand children. According to this blended criterion, the sums allowed for board, when a full allowance was made, would seem to be liberal enough.
As the testator requested that Maupin should account before the County Court, the few settlements made by that Court, should be deemed prima facie evidence as far as they go.
Wherefore, it is decreed and ordered, that the decree of the Circuit Court be reversed, and the cause remanded for further proceedings and decree.